WILLIAM ANEALS *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield November 1, 1890.*

1. CRIMINAL LAW—*alibi—proof in respect thereto—reasonable doubt.* Where the evidence of the presence of one charged with crime at a different place than that of the crime is not necessarily inconsistent with his having been present at the place when the crime was committed, as, where the accused might have been at both places, it will fail to establish the defense of *alibi.*

2. A jury must believe, beyond a reasonable doubt, from a consideration of all the evidence, that a defendant is guilty, including the question of an *alibi*, if that is involved in the defense, before they are justified in so finding; and an instruction on a question of an *alibi*, that

26—134 ILL.

|134   401|
|152   331|
'134   401|
: 53a  615|
, 57a  325|
| 134   401|
|  86a  216|
|134     401|
|191    6456|
|134     401|
|h206  8530|
|134     401|
|212  12439|

if, after considering all the facts and circumstances in proof, the jury had no reasonable doubt of the presence of the defendant at the place where the crime was committed, then the defense of *alibi* had not been made out, and was unavailing, is proper, and is not in conflict with the rule as to reasonable doubt.

3. SAME—*previous character of the accused—as an element to be considered.* On the trial of a party for an assault with intent to murder, the previous character of the accused is competent evidence to be considered by the jury on the question of guilt or innocence, and it is proper to be considered in mitigation of punishment. But the force of such evidence must always depend upon the nature and character of the inculpatory evidence.

4. IMPEACHING A WITNESS—*laying the foundation.* There is no error in refusing proof that a witness offered another witness a sum of money to testify to certain facts after he was informed that the supposed facts were not true, where no proper foundation has been laid in the examination of the witness thus sought to be impeached.

5. On the trial of parties for an assault with intent to murder, they called the foreman of the grand jury which found the bill, and asked him if a certain witness for the prosecution did not testify before that body to certain facts, and make statements named. There was no foundation laid for the evidence by calling the witness' attention to the time and place and the facts: *Held,* that the court properly refused the impeaching evidence sought to be given.

6. It is not proper to call a witness to contradict or impeach another witness in respect of matters occurring out of court, as, by showing that the latter had made some statement inconsistent with his testimony, unless the attention of the witness is first called to the time and place of the alleged statement, and he is afforded an opportunity for explanation in respect thereof.

7. On proof of the previous character of persons being tried for an assault with intent to murder, some of the witnesses said they had read a charge of poisoning horses by one of the defendants, which was first published after the defendants' arrest. The defendants then offered to prove that such charge was published at the instigation of H., a witness for the prosecution, which the court refused to admit: *Held,* proper, as no foundation had been laid for the evidence by the examination of H.

8. SAME—*recalling witness—to lay foundation to contradict him.* Ordinarily the court should allow a witness to be recalled for the purpose of laying the foundation to impeach him, by showing his statements out of court; but when the attention of counsel has been called to the rule, and a reasonable limit allowed to put the proper questions to the witness, the refusal of the court to allow the witness to be recalled is within the discretion of the trial court.

9. SAME—*proof of collateral matters.* On the trial of three for an assault with intent to murder, the defendants called witnesses to prove their previous good character, who were asked by the State's attorney if they had ever heard of the assault of one of the defendants on a third party, and some of them stating that they saw that assault, the defendants offered to prove what did occur at the prior assault, which the court refused to allow: *Held,* that the proposed evidence was properly refused, as calling for collateral matters.

10. SAME—*feeling and disposition of the witness toward the party—as a test of credibility.* Where a witness testifies to a threat made by a defendant against the prosecuting witness, such defendant may be asked whether he and the witness were on friendly or speaking terms, as tending to show the improbability of his having made the threats to such witness. But the refusal to allow such question will not prejudice the defendant, if he is allowed to deny making any such statements to the witness.

11. As to matters purely collateral, when the party calls them out on cross-examination, he is bound by the answer of the witness, but not so in respect of matters relevant and material to the issue being tried. The feeling and disposition of the witness toward the party is, however, relevant and material; and on cross-examination it is competent to test the witness in respect to his feeling, and if he has not done acts or used expressions showing hatred or ill-will toward the party against whom he is testifying, and if he denies the same, to introduce contradictory evidence by way of impeachment.

12. INSTRUCTIONS—*should not be marked as for either party.* The practice of marking instructions for the one party or the other is pernicious, and should not be tolerated. They should go to the jury as the instructions of the court, without anything to indicate at whose instance given.

WRIT OF ERROR to the Circuit Court of Adams county; the Hon. WILLIAM MARSH, Judge, presiding.

Mr. JOHN H. WILLIAMS, and Mr. CHARLES M. GILMER, for the plaintiffs in error:

The verdict of the jury should be set aside when the evidence does not sustain it. *Marlatt* v. *People,* 104 Ill. 364; *Mooney* v. *People,* 111 id. 388; *United States* v. *Jackson,* 29 Fed. Rep. 503.

Improper remarks by the trial court in the presence and hearing of the jury should not be encouraged.

The refusal of the court to permit proper questions to be asked witnesses, and answered by them on behalf of plaintiffs in error, was error. *Railroad Co.* v. *Pennell,* 110 Ill. 435; *Bressler* v. *People,* 117 id. 422; *Phenix* v. *Castner,* 108 id. 207.

The court should not have permitted improper questions to be asked witnesses by the prosecution.

The giving of an instruction at the instance of the People, purporting to have been given at the instance of the plaintiffs in error, was a clear error, and very damaging to plaintiffs in error.

The modification of instruction No. — by the trial court was calculated to prejudice the plaintiffs in error. *Chambers* v. *People,* 105 Ill. 409.

The giving of improper instructions at the instance of the People, against the objection of the plaintiffs in error, was error. *Mullins* v. *People,* 110 Ill. 42; *Leigh* v. *People,* 113 id. 372; *Davis* v. *People,* 114 id. 98.

Mr. GEORGE HUNT, Attorney General, for the People.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

At the May term, 1889, of the Adams circuit court, Francis Asbury Aneals, William Aneals and Louis Stormer were indicted for an assault upon James Knox with intent to commit murder. At the September term, 1889, the trial resulted in a verdict of guilty, fixing the term of Asbury and William Aneals, severally, at eighteen months in the penitentiary, and of the defendant Stormer at one year. A motion for a new trial was sustained as to Asbury Aneals, but overruled as to the other defendants, and they were severally sentenced on the verdict. They prosecute this writ of error.

The first contention is, that the verdict should have been set aside, because the proof failed to sustain it. No question is made that there is ample proof of the *corpus delicti.* The

only question of fact is as to the identity of the persons who committed the assault.

On April 27, 1889, about eight o'clock in the evening, while James Knox and his family were at the supper table, two masked men entered the house, and saying only, "Hold," fired two shots at Knox from a revolver, each firing one shot, one taking effect in the nose of Knox, and the other missing him and passing out through a window. The assailants then backed out of the house, drew shut the door, and disappeared. There were present James Knox, his wife, Samuel Knox, (a brother of James,) Miss Agnes Laage and Miss Hattie Wible. The latter two had just arisen from the table. Miss Laage was within four feet, and possibly nearer, of the smaller of the two assailants. One of the assailants was considerably larger than the other. The larger one came in first, but the smaller stepped farthest into the room. Samuel Knox was ten or twelve feet from the door at which the assailants entered, which was on the south side of the room, winding the clock, which hung on the west wall of the room.

James Knox was unable to identify either of the assailants, and unable to give any description of them, except that the smaller of the two was a man from five feet six inches to five feet eight inches high, weighing one hundred and thirty or one hundred and forty pounds, "longish neck," shoulders not broad, but square. Miss Laage, who was nearer than the others, says that one was quite a little smaller than the other in size, build and height; that she noticed the eyes of the smaller one, particularly, through his mask. She also noticed that the hair of one of the assailants was dark and the other light. On the following Saturday morning this witness and others went to Aneals and Stormer's, to see if they could identify any one. She says that Stormer's build and size resembled very much the size and build of the smaller of the assailants. He had light blue eyes, and a peculiar stare about them "that I noticed particularly that night." She also

states that the eyes were rather small, and through the mask they seemed rather round than oval. The larger of the two men had dark eyes and hair. Both wore light-brown or grey suits, and hats the same color. The larger one had a large hat, the other a .small one. The larger one had square shoulders, was firmly built, and straight. She testified that the description of the larger one answers to that of William Aneals "very well." She was unable to recognize any one as the assailant, but testified that the two defendants, William Aneals and Louis Stormer, resembled the parties who made the assault. On the motion for a new trial she filed an affidavit stating that she did not believe the defendants were the assaulting parties, and did not intend to be so understood in giving her testimony.

Miss Wible was unable to identify any one, while she agrees with the other witness, in the main, as to the description of the persons who made the. assault. Samuel Knox testified that he had known William Aneals from infancy, and was familiar with his size, form, and general appearance. He describes particularly the clothing and hats of the assailants, and says he saw William Aneals wear a hat like the one described by him, on May 6, in Quincy. He saw him clearly at the time of the shooting,—saw none of his face but his chin, and that resembled the chin of William Aneals. He testified that he thought he knew these men, and was satisfied from what he saw that William Aneals was one of them. On cross-examination of this witness much occurred. that might very properly weaken the force of his testimony.

It is made to appear with reasonable certainty that no one came out on to the road or public highway in front of the house immediately after the. shooting, but back of the house, near the hedge, it was found that two horses had been hitched, and an opening had been made through a rail fence, and that horses had passed through the same, going north. The rails had been recently let down, and horses led or rode over them.

On the fence were found prints of horses' feet, and black and bay horse hair. The horse tracks led in the general direction of where Aneals and Stormer lived,—that is, northerly. One of the horses that made these tracks had two shoes behind and one in front. The other was shod in front, only. The large tracks were made by the horse having three shoes.

Knox lived on the east side of section 15. To go to Aneals' through the fields would be from a mile and a half to two miles north, and a half mile west. The witness Carroll had been at Ingraham's, substantially half a mile west from William Aneals', and was at the gate "at the corner," about two hundred yards from Aneals' house, where the road turns north to Bloomfield. At about 8 : 30 o'clock he saw two persons on horseback coming from the south, (and which would be from the general direction of Knox's,) going north. At the corner mentioned the riders turned east. He thought he recognized one of them as the defendant William Aneals, and called to him by name, but received no reply. He also thought that he recognized the horse next to him,—the larger of the two horses,—and it was, as he thought, the horse that William Aneals had shortly before that purchased of Louis Fogle. It was moderately dark, and the moon was not shining. These persons were riding in a "fair lope."

Two witnesses examined the horse tracks found near Knox's house and in the field. Subsequently the witnesses Carroll and Hunter examined William Aneals' horses, and found a large mare belonging to him, with two shoes behind and one in front, which Carroll testifies was the Fogle mare, and whose feet, they testify, "compared exactly" with the larger tracks found at the fence and in the field near Knox's house. One witness, at least, went to Asbury Aneals' barn, and found a horse shod in front and bare behind, the tracks of which were apparently the same as the tracks of the other horse found back of Knox's house and in the field. The horse hair found at the fence was of the same general color as the hair upon

the legs of the two horses mentioned by the witnesses. On Thursday following the shooting, Carroll saw the Fogle mare at William Aneals', and the hair had been cut off of her legs,— when, however, does not appear.

The evidence shows, that a short time prior to the assault Asbury Aneals and James Knox had had some difficulty over local political affairs. Much ill-feeling seems to have been engendered at and before the caucus which nominated both of these men for office,—Aneals for supervisor, and Knox for assessor. Knox was elected and Aneals defeated. William Aneals is the son of Asbury. Louis Stormer lived near the Aneals, and at the time of the assault was in William Aneals' employ. About a week after the election, the witness Altenheim testifies, Asbury Aneals said, when it was remarked that Knox was elected, that "he would never serve." The witness Gould, who claims to have been present, corroborates the statements of Altenheim, which are denied by Aneals.

The defense was an *alibi.* In respect of the evidence, of which the foregoing is but an imperfect epitome, it must be said, the jury heard the descriptions given of the assailants,— particularly of the one alleged to have been Stormer,—and had the opportunity of comparing them with the defendants as they appeared on the trial; they saw the witnesses, could observe their demeanor, and thereby judge of the weight and credit due to each,—all of which is denied to us. If the description of the smaller of the two assailants, in connection with the other facts and circumstances proved, satisfied them, beyond a reasonable doubt, as to his identity, they were justified in finding him guilty. In respect of the defendant William Aneals, if they believed his identification by the witnesses Samuel Knox and Carroll was sufficiently certain, when taken in connection with the very strong circumstances proved tending to connect him with the commission of the offense, to remove all reasonable doubt as to his identity, they were likewise justified in their verdict, unless a reasonable doubt of

the guilt of said defendants, or one of them, was created by the evidence of good character of the accused, and of that tending to prove an *alibi.* No motive in respect of the defendant Stormer is shown, unless it can be traced to the fact that he was the friend of and was working for the Aneals. In respect, however, of William Aneals, it can not be said that evidence of motive was altogether wanting. James Knox had declined to run for office on the ticket with Asbury Aneals, the father of William, and the brother of Knox had stated in open caucus that he was ashamed to have his brother run on the same ticket with Asbury Aneals. Both, however, ran, and Aneals was defeated and Knox elected. It seems that the former was much incensed. Knox was also a school director, and Asbury Aneals said to the witness Whitler that he wanted Knox out—he wanted "the scoundrel out."

In view of the facts and circumstances proved, it can not be said that there was not sufficient evidence upon which to predicate a verdict of guilty, if the jury believed it to be true. And as to the *alibi,* it must be said, when the evidence is all considered, that the defense is not established; and the jury were, we think, justified in concluding that the presence of the plaintiffs in error at the store in Bloomfield at from about eight o'clock to about ten o'clock on the night of the assault, was not necessarily inconsistent with their being present at the time and place of the assault. Perhaps the weight of the testimony in support of the *alibi* is, that William Aneals came to Davis' store in Bloomfield *about* eight o'clock. Some of the witnesses for defendants, however, put it later, and that Stormer reached the store five to ten minutes later than Aneals. To illustrate: John Carlin came to the store between half-past seven and eight o'clock, and says: "I saw Aneals when he came in. I was there quite a while before he came in." And further says: "To the best of my opinion it was somewhere about 8:30 when I first saw William Aneals at the store." Henry Nedick, who was at Davis' store on the even-

ing in question, was produced by the plaintiffs in error.  He
lived about three-fourths of a mile from Bloomfield.  He says :
"I looked at the clock before I went.  It was just eight o'clock.
It struck while I was looking."  He then says he started with
a little boy and walked to the store, taking about fifteen min-
utes' time.  Aneals was then at the store, and Stormer came
about ten minutes later,—which would indicate that Aneals
had just arrived.

The difference of time of the coming of Aneals and Stormer,
as shown by all the proof, would indicate that Aneals, as be-
fore said, had just arrived at the store, so that it is possible,
if not quite probable, in view of all this testimony, that the
arrival of Aneals was later than eight o'clock.  The distance
from Knox's house to Aneals', by the road that Carroll saw
the parties mentioned by him coming, would be from two and
a half to three miles, and from Aneals' to the store about
three-fourths of a mile, and from Stormer's to the store but a
few hundred yards.  When the persons described by Carroll
passed him, the horses were on a "fair lope."  It is apparent
that if these plaintiffs in error were escaping from the scene
of their crime, but a very few moments would be required, to
cover these distances.  It appears from the testimony intro-
duced by plaintiffs in error, that they ate supper together at
William Aneals' house, and Stormer's presence is unaccounted
for by any evidence save that of plaintiffs in error, from that
time until he reached the store, except from two to six minutes
that he was at his father's, before walking the five or six hun-
dred yards from his father's house to the store.  It is also to
be remembered, that no one at Knox's pretends to have looked
at any timepiece, or to give any more definite statement of
the time than that it was about eight o'clock.  No data is
furnished from which that conclusion is reached, and, taking
into consideration the time intervening before any person left
the house to send for a doctor, the time they were gone when
they did go, and the distance traveled, in connection with the

testimony of the physician that he was called at nine o'clock, started for Knox's fifteen minutes thereafter, and arrived there at about ten o'clock, or a few minutes later, it would seem to very clearly indicate that the assault might have been committed some time before eight o'clock. Some of the persons had just risen from the supper table, and Knox and his wife were still at the table when the assault occurred. On the one side, those witnesses who seemed to have looked at timepieces place the arrival at the store in Bloomfield later than eight o'clock, while on the other, no one pretends to have known the exact time of the assault. It is very clear that a half hour, or even less, would have sufficed for the commission of the offense and the arrival of the plaintiffs in error at the store in Bloomfield. We can not say, in view of this evidence and the circumstances proved, that there was necessarily such inability for the plaintiffs in error to commit the offense as would create a reasonable doubt of their guilt.

It is objected the court erred in not permitting the plaintiffs in error to show, by the witness Gould, that the witness Hunter offered him $50 to testify to certain facts, after Hunter was informed that the supposed facts were not true. No foundation had been laid in the examination of Hunter, who was a witness for the People, and the evidence was therefore improper, and the court properly excluded it. For the same reason like questions asked of the witness Dudley and others were held to be improper, and objections thereto sustained. In like manner, the plaintiffs in error produced one Judy, who was foreman of the grand jury, and he was asked if Samuel Knox did not testify before the grand jury in respect of certain material matters in a particular way,—that is, as to whether or not he did not then state that he did not know and could not recognize either of the men making the assault, etc. No foundation whatever was laid in the testimony of Knox for the introduction of this testimony. And precisely the same is true in respect of the offered testimony of the witness Pur-

cell and others. No good purpose can be subserved by noticing these objections in detail. They all rest upon the same basis, and the ruling of the court was for the same reason proper. It is not proper to call witnesses to contradict or impeach a witness in respect of matters occurring out of court, as, by showing that he has made some statement out of court inconsistent with his testimony, unless the attention of the witness is first called to the time and place of the alleged statement or declaration, and he is afforded an opportunity for explanation in respect thereof. This rule is so familiar as to require the citation of no authorities in its support.

Numerous other objections are made in respect of the rulings of the court on the introduction of testimony, some of which may properly be considered.

The defendants produced a large number of witnesses who testified to the previous good character of the defendants,—some to all, and others to one or more of them,—of whom the State's attorney inquired if they had not heard of an assault by Asbury Aneals (who, it will be remembered, was also on trial,) upon one Sigsby, and whether they had not heard of his being accused of poisoning Sigsby's horses. Some of these witnesses stated they had heard of the supposed assault on Sigsby, and others that they had seen the occurrence. Thereupon counsel for defendants insisted upon their right to have the witnesses state what did occur between Aneals and Sigsby, to which the court sustained an objection, and, we think, properly so. To have permitted the witnesses to detail what occurred at that time, would have necessitated a trial of a purely collateral question. Trials would become interminable. It may be safely stated that there is neither reason nor authority for the position of counsel.

Some of the witnesses said they had heard of the charge of poisoning, after the assault in this case,—that it was first published in a newspaper in Quincy, after the arrest of the defendants. The defendants then offered to prove that it was

published at the instigation of the witness Hunter, to which objection was made, and the objection sustained. No foundation had been laid in the examination of Hunter for this character of proof. Moreover, the testimony in respect both of the assault and poisoning related only to the defendant Asbury Aneals. In no way was the defendant William Aneals or Stormer connected with either of said matters, or the rumors in respect thereof. In no event would it be error of which they could complain.

We are of opinion that it would have been proper to have permitted the defendant Asbury Aneals to answer as to whether he and the witness Altenheim were on friendly or speaking terms at the time referred to by Altenheim, when he says Aneals said that Knox would never serve as assessor, as tending to show the probability or improbability of his having made the statement imputed. But the defendants received the full benefit of Asbury Aneals' denial of the statement attributed to him, and his testimony could not have been made stronger by this additional statement. It is impossible that the defendants could have been prejudiced by this ruling.

It is urged with great pertinacity that the defendants should have been permitted to show, as a substantive fact, that the witness Hunter had ill-feeling and hatred towards the defendants, and was actuated by corrupt motives. The witness Hunter admitted, on his cross-examination, that a reward of $1000 had been offered for the arrest and conviction of the assailants, and he was then asked, "Is it not a fact that your interest in it was of the money reward which was offered," and he answered, "Of course, if I get the right parties,—if I get the right parties I expect to get the reward." He then testified that he had no ill-feeling toward any of the defendants, that he had not talked slightingly or bitterly about them, had not called them names, or used expressions of that kind. He was asked if he had not made such statements to Colburn, and said no.

As to matters purely collateral, where the party calls them out on cross-examination, he is bound by the answer of the witness. But not so in respect of matters relevant and material to the issue being tried. The feeling and disposition of the witness toward the party are held to be relevant and material, and on cross-examination it is competent to test the witness in respect of his feelings, and if he has not done acts or used expressions showing hatred or ill-will toward the party against whom he is testifying, and, if he denies the same, to introduce contradictory evidence by way of impeachment. (1 Greenleaf on Evidence, sec. 450; *Phenix* v. *Castner,* 108 Ill. 207, and authorities cited.) But the rule in respect of the contradiction of the witness in such matters is the same as in respect to any other matters material and relevant to the issue. Before witnesses can be called to show that statements have been made out of court inconsistent with those testified to at the trial, it is necessary, as before said, to lay the proper foundation, by calling his attention to the time, place and person involved in the supposed contradiction. Then, if he denies having made the declaration or done the act imputed, the contradictory evidence becomes proper. This we understand to be the uniform practice, and to which we are not aware of any exception. (1 Greenleaf on Evidence, sec. 462; *The Queen's case,* 2 Brod. & Bing. 313; *Conrad* v. *Griffy,* 16 How. 38.) As before stated as respects the witness Purcell and others, so in respect to the witnesses Colburn and Gould, no proper foundation was laid for the offered testimony, although the attention of counsel was called, during the examination of Hunter, to the necessity therefor, by the court, and of which they now complain.

In view of the fact that the court called the attention of counsel to the omission, and the many interrogatories put to Hunter upon the subject of his feelings, we can not say that it was an abuse of the discretion lodged in the court to refuse to permit Hunter to be recalled, for the purpose of laying the

foundation for the introduction of other and different matters, or statements alleged to have been made at other times and places. Hunter had been asked respecting a statement at Colburn & Baker's store, and if he had not used certain language. The witness testified that he had not used that language, but that in a conversation before Urban's saloon something had been said by Hunter. Upon objection being sustained, defendants asked to recall Hunter, to lay the foundation for the conversation at Urban's saloon, which the court refused to permit. Ordinarily the discretion should undoubtedly have been exercised. But, as before said, a reasonable limit had been allowed. The attention of counsel had been called to the rule, which they seemed to regard as an unjustifiable interference on the part of the court, and we can not say that there was any abuse of discretion.

We have thus carefully gone through the evidence, and the many objections urged, for the reason that the case is close in some respects, and if any error had intervened prejudicial to plaintiffs in error, or that might have unduly prejudiced them before the jury, however slightly, we should have been disposed to reverse the judgment.

The character of plaintiffs in error previous to this charge was shown by a greater or less number of witnesses to have been good, and such evidence was competent to be taken into consideration by the jury in determining their guilt or innocence. The probative force of such evidence in each case must always depend upon the nature and character of the inculpatory evidence; and it may, and no doubt often does, of itself, properly create such a reasonable doubt in the minds of the jury as will justify an acquittal. But it is to be remembered, that the weight to be given to the evidence is peculiarly within the province of the jury, and unless we can say that the finding is palpably wrong, we ought not to interfere upon the facts, alone. This we can not say in this case. Not only may the jury consider the evidence of good character upon

the question of guilt, but if they feel constrained to find the defendant guilty, it is proper to consider the same in mitigation of punishment,—and it would seem that the jury have done so in this case.

The jury were fairly and fully instructed as to the law of the case, to which there is no material objection urged. Objection, however, is made to an instruction given for the People. The objection is, "that the reasonable doubt in each of them ought to be as to the guilt of the defendants." The criticism is not warranted. The instruction relates to the question of *alibi.* The jury must believe, beyond a reasonable doubt, from a consideration of all the evidence, that the defendants are guilty, before they would be justified in so finding. But these instructions did not relate to the question of guilt or innocence, strictly. By them the jury were told, in effect, that if, after considering all the facts and circumstances in proof, they had no reasonable doubt of the presence of plaintiffs in error at the house of Knox at the time of the assault, then the defense of *alibi* had not been made out, and was unavailing. The instructions were entirely proper, and not in conflict with the rule stated.

It is also objected that one of the People's instructions was marked "For defendants," and it is urged that some inference might be drawn therefrom by the jury different from what would have been drawn had it been properly marked "For the People." The contention is without merit. The practice of marking instructions for the one side or the other is pernicious, and should not be tolerated, if thereby inferences are to be drawn by the jury. The instructions should go to the jury as the instructions of the court, and the better practice is, to have nothing appearing on the instructions showing at whose instance they are given. But there is nothing here that in any way indicates that any inference prejudicial to the plaintiffs in error was drawn by the jury, or that such could have been the effect. The instruction itself relates to what was

proper for the jury to take into consideration in considering of their verdict, and was eminently proper to have been given at the instance of either party, or by the court itself, on its own motion.

We are of opinion that no substantial error has intervened appearing upon this record. The judgment of the circuit court must be affirmed.

*Judgment affirmed.*