SOPHIA PORTER, Appellee, v. GRACE HEISHMAN, Appellant.

**HUSBAND AND WIFE:** Alienation of Affections—Verdict—Sufficiency of Evidence. Evidence reviewed, and held sufficient to support a verdict in some amount for the alienation of the affections of a husband for his wife.

**WITNESSES:** Impeachment—Hostility. It is always relevant to inquire of a witness whether he is not hostile to the party against whom he is testifying, and whether he had not made threats to testify against such party, and, with proper foundation therefor, the witness may be impeached.

**HUSBAND AND WIFE:** Alienation of Affections of Husband—Excessive Verdict—$10,000. In computing the damages suffered by a wife because of the alienation of the affections of the husband for the wife, the all-important inquiry is: What has the wife lost in the way of affections? Were the relations between the wife and

her husband, prior to the alienation by defendant, of the most ami-
cable, harmonious and loving character, or had the wife, from
other causes, already lost in large degree the affections of the hus-
band? Tested by this rule, *held*, a verdict for $10,000 was, under
the record, excessive.

*Appeal from Grinnell Superior Court.*—P. G. NORRIS, Judge.

WEDNESDAY, OCTOBER 27, 1915.

REHEARING DENIED THURSDAY, APRIL 6, 1916.

ACTION at law to recover damages from the defendant
for the alienation of the affections of plaintiff's husband.
Upon issues joined, the case was tried to a jury, resulting in
a verdict and judgment for plaintiff in the sum of $10,000,
and defendant appeals.—*Reversed* and *Remanded*.

*J. H. Patton* and *W. R. Lewis,* for appellant.

*Bray, Shifflet & Wilkie,* for appellee.

DEEMER, J.—I. Plaintiff was married to Art Porter in
January of the year 1902. She was his senior by several
years, and at the time of his marriage, the husband was a
minor. After marriage, they lived on a farm
for some years, when they, in the year 1909,
moved to Grinnell, and shortly thereafter, the
husband became interested in the automobile
business, conducting a small garage and
repair shop.

1. HUSBAND AND
WIFE: aliena-
tion of affec-
tions: verdict:
sufficiency of
evidence.

Defendant is the wife of E. C. Heishman, and they, too,
lived on a farm for some years before moving to Grinnell,
some time in the year 1908. At the time of trial, defendant
was about 42 years of age, and she·had two sons, one 21 and
the other 19 years of age. According to the record, defendant
became acquainted with Art Porter some time in the year 1911,
the exact time being in dispute; but the acquaintanceship
was not earlier than February and not later than the fall of

that year.   The defendant's husband owned an automobile, and had occasion to have it repaired and to buy supplies for it from Art Porter.   This commenced some time in the fall of the year 1911.   Some time in the fall of 1911, the Porter family arranged to get milk from the Heishmans, and, for some months, either plaintiff's husband went for it or it was delivered to the Porters by one of the defendant's boys.   At the time when plaintiff was getting milk, he (Art Porter) would go frequently into the defendant's house and play cards with defendant's husband or the boys.   Porter rode in the Heishman auto several times during the year 1911, and, becoming an agent for the sale of what is known as the Carter car, he thought the Heishmans a good prospect, and took them riding several times in one of these cars.   Finally the family became interested in the new car and agreed upon its purchase, delivery to be made at Des Moines on the fourth day of July, 1912.   Defendant had not met the plaintiff until that day, when plaintiff insisted upon making the trip to Des Moines with the Heishmans, to get the car.   On the day preceding, plaintiff and her husband had some words about the Des Moines trip and regarding the defendant; and plaintiff testified that, on this occasion, her husband struck her, knocking her down and giving her a black eye.   On the next day, plaintiff and her husband and defendant and her husband went to Des Moines to get the car.   All rode in the car that day and spent part of the afternoon in one of the parks in the city; but they did not drive the car home.   Plaintiff says that this was by reason of a prior agreement between her husband and Mrs. Heishman that they would not take it back to Grinnell with them that day, but would return and bring it back when plaintiff was not along.   In any event, plaintiff's husband, defendant and one of her sons went to Des Moines on the sixth day of July and brought the car back to Grinnell.   It was arranged at the time of the purchase that the car should be kept at Art Porter's garage after it was brought home, and

that Porter should teach the defendant how to drive it. There was also some kind of an arrangement to store the auto without expense by Porter, in order that he might use it for demonstrating purposes. Plaintiff says that she became suspicious of her husband's conduct with defendant some time prior to the making of the Des Moines trip, and had trouble with him over his conduct with Mrs. Heishman; and, on the morning of July 4th, said to defendant that there was too much talk going around about her riding around town so much with plaintiff's husband. This was squarely denied by defendant, who says that no complaint was made to her until about Christmas of the year 1912.

To all outward appearances, the relations between the two families were amicable until the month of December, when plaintiff upbraided the defendant because of the talk about her and plaintiff's husband. This was again repeated in January, 1913, in a talk between plaintiff and defendant and her husband. Before that, the parties were frequently together; they took many rides in automobiles around the city and into the country, attended band concerts and moving picture shows, and the defendant and her family had Thanksgiving dinner at the Porter home. All family relations were broken between plaintiff and the defendant and her family at this January meeting, and plaintiff's husband left home and did not return until February 27, 1913, remaining but for a few days, and then taking what was supposed to be his final departure, but returning again in May, after plaintiff had brought this suit, when it is claimed he threatened to kill her, and locked her in a bathroom until she would sign some papers disposing of this action. In September of the year 1912, plaintiff's husband and defendant attended the Marshalltown Fair together, taking defendant's machine there for demonstrating purposes. According to some of the witnesses, and as stated by defendant, she went under an arrangement that she should receive pay for her time while there, for allowing her car to be used and for assisting in making sales. The

two stayed in Marshalltown for several days, until they were located by the plaintiff. After that, they made a trip together in company with defendant's sister-in-law and another man, and there is ample testimony, if believed by a jury, to show that the plaintiff's husband and the defendant had sexual intercourse on both occasions. There is also a great deal of testimony tending to show that plaintiff's husband was frequently at defendant's house at all times of the day and night, ofttimes when defendant's family was away from home; that defendant was daily and often several times a day at the Porter garage; that they had long daily conversations over the telephone; and that plaintiff's husband called defendant endearing names. They were seen quite often together at Des Moines and Colfax, sometimes at hotels and at other times on the street, or in stores. There is also testimony that plaintiff's husband purchased clothing and gave it to the defendant, although this is denied by defendant and her husband.

Although this is but a part of the record, enough has been recited to show that there is ample testimony to support a verdict for the plaintiff in some amount, and that there is no merit in the defendant's contention that plaintiff did not make out a case for the jury.

II. Some rulings on testimony are challenged. We shall refer to but one of them, as the others are manifestly correct, and need no attention, because they involve no new or doubt-

2. WITNESSES: impeachment: hostility.

ful propositions. One R. J. Patterson, a witness for the plaintiff, gave very material and damaging testimony regarding the conduct of plaintiff's husband and the defendant while at the Marshalltown Fair. For the purpose of showing his interest in the case and his hostility to the defendant, the following record was made:

"I do not know Robert Ramsey. I did not to my knowledge meet him and talk with him here in Grinnell when I was here on the other trial. Q. And did you have a talk with some man and Arthur Porter here on the streets here in Grin-

nell while you were here attending the other trial? A. No, sir. Q. And didn't you talk with him and Arthur Porter here on the streets in Grinnell about the fact that you had a woman here at the Monroe Hotel when you were here at that time? (Same objection by plaintiff as last made—incompetent, irrelevant, immaterial, not proper cross-examination. Overruled, and plaintiff excepts.) A. No, sir. Q. And did you talk with them on the streets here in Grinnell at the time you were here attending that trial about having registered at the Monroe Hotel as R. G. Bates and wife? A. No, sir.

"Mr. Bray: Same objection.

"The Court: You may answer.

"Mr. Bray: If the court please, it seems to me that this is the same identical proposition.

"The Court: This is as to his statement about it.

"Mr. Bray: But I want to call your honor's attention to this proposition. The only statements they can prove by him are any statements which are contradictory of the testimony he has given on this trial, and which are material. If it were true that this man has committed an immoral act, and if he had made statements about it, that contradicts nothing that he testified to as a witness. I don't know under what rule that would be admissible. It is exactly in the same class with the other testimony that has been excluded.

"The Court: Yes; I think so. The answers to those last two questions may go out. (Excepted to by defendant.)

"Q. And did you not say to them on the streets here in Grinnell at the time you were attending that other trial of this case that, if they brought that fact—that is, that you had a woman there at the hotel that was not your wife—against you, that if they brought that back against you, didn't you in substance say to them you would go on the witness stand and give the defendant hell? A. I did not. Q. And did you not in substance at that time, that same time, to these same parties in the same place, say in substance that you would testify that you and Art Porter had gone to Marshalltown

with the Heishman women and slept at hotels with them?
A.  I did not."

Ramsey was produced as a witness for defendant, and
the following is taken from the record:

"I was here at the former trial of this case in June and
July.  I know R. J. Patterson when I see him.  I had a conver-
sation with him here in Grinnell during that trial.  Q.  Did
he say to you in substance in that conversation that if they
brought up something that occurred down here at the Monroe
Hotel against him that he would go on the stand as a witness
and give them hell, and that he would tell something they did
not want to hear?  (Objected to as incompetent, irrelevant
and immaterial, and if for the purpose of impeachment, no
sufficient foundation has been laid for this testimony.  Objec-
tion sustained, and defendant excepted.)"

Facts showing hostility of a witness are not collateral to
the main inquiry; and if a witness denies this hostility or
denies having made statements showing such hostility, he may
be contradicted and also impeached by showing that he made
such statements.  No objection was made to the interrogatories
laying the foundation for the impeachment, and a proper
foundation was laid for Ramsey's testimony.  We think the
ruling sustaining the objections thereto cannot be sustained.
*Powell v. Martin,* 10 Iowa 568; *Rice v. Rice* (Mich.), 62 N. W.
833; *Alward v. Oaks* (Minn.), 65 N. W. 270; *Beardsley v.
Wildman,* 41 Conn. 515; *Aneals v. People* (Ill.), 25 N. E. 1022;
*Skinner v. State* (Ind.), 22 N. E. 115.

III.  The verdict for $10,000 is said to be excessive.  We
are constrained to hold that this is true.  In order to sustain
so large a recovery, it is necessary to show that the relations
between the plaintiff and her husband were

3. HUSBAND AND
WIFE: aliena-
tion of affec-
tions of hus-
band: exces-
sive verdict:
$10,000.

of the most amicable, harmonious and pleas-
ant character; that the defendant ruthlessly,
maliciously and without excuse disturbed
these relations, and by her own machinations
destroyed the husband's love for his wife and broke up the

theretofore pleasant relations existing; that, prior to that time, plaintiff's husband was faithful and true and religiously observed his marital obligations; and that he was led astray by the wicked wiles of the defendant. If he, instead of the defendant, was the aggressor; if his love and affection for his wife were of such character that, notwithstanding, he sought the society of other women and left his home to gratify sexual or other passions, defendant should not be held liable to the same extent as if she alone were to blame. In all such actions, the law must take into account the nature and character of the husband's affections, his loyalty to his home and to his wife, whether he was seeking the company of other women, and generally the nature of defendant's wrong and her responsibility for the situation. The testimony shows beyond all possibility of dispute that, before Porter met the defendant, or at least before the relations between them were any more than formal, he (Porter) frequently went to Des Moines, where he would stay several nights at a time; that he carried a key to a room in the city of Des Moines; that he frequently was in company with strange women in Des Moines and occasionally met them by appointment; that he became infected with a venereal disease; that he purchased shoes for a Des Moines woman; that, in his conduct with some young women, he caused his wife to become suspicious of him. In the fall of the year 1911, trouble arose between him and his wife over his conduct with other women, and he frequently abused his wife because she upbraided him. In his relations with the defendant, he seemed to be the aggressor. The first times they went out riding were on his invitations. According to the testimony, Porter made most of the advances, and after a time, was not at all secretive in his conduct. He planned most of the trips away from home and was largely responsible for the defendant's conduct, whatever it may have been. We are not to be understood as saying that plaintiff is not entitled to some damages, although her husband may have been at fault. What we do mean to hold is that plaintiff's husband

indicated by his conduct that she had largely lost his affections before the defendant came into their lives. They had trouble regarding sexual intercourse with each other, and there is testimony tending to show that he lost his affections for her and requested her not to be so demonstrative of her affections. Whatever the faults of the defendant, plaintiff's husband did not repel her advances, but courted and solicited them, thus demonstrating to some extent his want of affection for his wife.

A verdict of $10,000 under this record, which we have not attempted to set out in detail, must have been the result of passion and prejudice, and not of deliberate judgment. From a financial standpoint, plaintiff lost nothing but the support of her husband. He had no means save what he earned from day to day; and while this is not in any sense controlling, it is important to be considered in looking at the verdict. Plaintiff is entitled to such damages as resulted from defendant's wrongful conduct, but not for any infringement of her marital rights due to some other cause. The case differs somewhat from one where a man steals away the affections of a wife. In such affairs, the man is generally the aggressor. By nature, it is the male of the species, and not the female, who makes such advances. It is not true in such matters that the female is more deadly than the male. Of course, a woman may become so depraved, especially in sexual matters, as to be worse than the man; but even then, the male usually makes the first advances. Were there no other ground for setting aside the verdict than the amount thereof, we would feel it our duty to reverse the case for that reason alone.

IV. Other matters need not be considered, for they are not likely to arise on a retrial. We discover no errors in the instructions of which defendant may complain, or in the rulings on testimony, save as above indicated;. but for the reasons pointed out, the judgment must be and it is—*Reversed and Remanded.*

WEAVER, GAYNOR, PRESTON and SALINGER, JJ., concur.