People of the State of Illinois, Defendant in Error,
v. Emanuel Wade, Plaintiff in Error.

Gen. No. 51,034.

First District, Fourth Division.

May 27, 1966.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (William D. North, of counsel), for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James Zagel, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE McCORMICK delivered the opinion of the court.

CHARGE: Murder.[1]

---

[1] Ill Rev Stats 1965, c 38, § 9–1. *"Murder.*] (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

**DEFENSE AT TRIAL:** Excusable homicide by misadventure.

**JUDGMENT:** After a trial by a jury the defendant was found guilty; the court entered judgment on the verdict and imposed sentence of not less than 20 nor more than 25 years. The defendant took a writ of error to the Illinois Supreme Court, which court transferred the case to this court.

**POINTS RAISED ON APPEAL:**

(1) The charge was not proved beyond a reasonable doubt.

(2) The trial court erred in refusing to instruct the jury on the law relevant to "excusable homicide by misadventure."

(3) The trial court erroneously refused to instruct the jury on the law relevant to verbal admissions.

(4) The trial court erroneously permitted the jury to know which instructions had been requested by the State and which had been requested by the defense.

(5) The argument of the State's Attorney was prejudicial to the defendant.

**EVIDENCE:** Testimony of State witnesses.

Certain of the coworkers of the deceased testified in the trial, among them Mrs. Laura Coleman, who stated in her testimony that she left her place of employment shortly after 4:30 p. m. and walked to her car which was parked on Racine Avenue; that after she reached the car she saw the defendant and his wife, Lorene Wade (the deceased), standing approximately 2 feet from each other at a distance of about 10 or 12 feet from the witness. She testified that she heard the defendant

---

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter."

say to Lorene: "Oh, you're not going with me, huh?" She stated that Lorene, while backing away, replied: "Yes, I am going," and that thereupon the defendant drew "something right fast, real shiny"; that the gun was fired and Lorene fell; that the defendant then walked to Madison Street, turned west and started running.

Mrs. Pearl Albright testified that she and Lorene used to ride to work with a girl called "Shorty"; that Lorene with the witness and Shorty had left the building in which they worked, and turned to go to Shorty's car; that Lorene was walking about three feet in front of her; that Shorty pulled the car out into the street, and the witness looked back and saw Lorene talking to the defendant. She stated that Lorene said, "I'm going, I'm going," and that she kept going backwards from the defendant, who followed her; that Lorene then told him that she was not going, at which time the defendant drew his gun and said, "I'm not kidding with you," and shot her. The witness further testified that "it looked like to me he pulled it from his belt . . . right in front . . . [with] his right hand." She stated that the defendant then started to walk west, and that she went back to her place of work to have someone call the police.

Sergeant Frank Youhn of the Chicago Police Department testified that on March 5, 1963, he saw the defendant at the 12th District Police Station at about 4:35 p. m.; that the defendant told him he wanted to turn himself in, that he had shot his wife. Sergeant Youhn asked him why he had killed his wife and he answered, "She stole my money." Sergeant Youhn stated that the defendant told him he had shot her and that he still had the gun; that the defendant took the gun out of his right-hand coat pocket and handed it to the sergeant with his right hand.

205

**Testimony of defense witnesses:**

Detective Leonard Zaleski, of the Chicago Police Department, testified that he saw the defendant on March 5, at about 5:00 p. m. at the 12th District Police Station where he and Detective Brown questioned the defendant; that the questions and answers were recorded and the statement signed by the defendant.

The defendant took the stand and testified that he had married Lorene on August 13, 1960, and that they lived together as husband and wife until November 24, 1962, when they separated; that after the separation Lorene lived about three blocks from the defendant's place of abode. He stated that Lorene had called him on March 4, asking him to meet her on March 5, after work; that after some difficulty in finding a place to park, he met his wife and Mrs. Albright at about 4:30 p. m., on Racine Avenue; that he suggested to his wife that Mrs. Albright come with them and that they go to his car. He stated that he then went back to Mrs. Coleman's car and told the women that his wife was going with him and that she had said they could go ahead. He stated that Lorene then started back towards him and said, "I just wanted to get you over here, and say I have asked you a dozen times to come down to the house where I live at and you refused to come." The defendant stated that he then told her he was going on; that as he started to walk away Mrs. Albright walked towards him, holding her hands under her coat; that his wife also started towards him, and he reached into his pocket to get the gun he was carrying; that he pulled the gun out and it went off. He testified that after he walked away from the scene of the shooting he went to his car and drove to the police station where he told the sergeant he had accidentally shot his wife and he wanted to get her to the hospital; that the sergeant asked if he had the gun on him; that he said he did,

206

and gave the gun to the sergeant. The defendant stated that the thumb and three fingers of his right hand are missing; only the little finger is intact. [The jury had the opportunity to observe defendant's hand, and it was indicated in the argument, without objection, that only parts of his thumb and of three fingers were missing.] The defendant also testified that he was afraid to go to his wife's house, although he wasn't afraid of her, and that at the time she came towards him his wife called him "a dirty name" and started towards him with her hand in her purse as though she were coming up with a knife or gun, and that Mrs. Albright was coming towards him from the side, and he got scared; that "the gun went off accidentally. I don't even remember, all I remember was hearing a shot." The defendant was then asked to hold the gun in his right hand in the presence of the jury. The defendant also testified that he had ordered the gun by mail from California and it was delivered two or three days before the 5th of March; that previously he had another gun and had loaded the new gun with bullets he had for the old one; that he took the gun with him when he went to see his wife because he had been threatened by her before that time and knew his wife had carried a knife and a gun.

In his written statement to Detective Zaleski, defense witness, the defendant stated:

"She asked me to meet her and we would have a talk about some financial money problems. And then I came down to Madison and Racine to meet her. After meeting her I asked her could I have a talk with her. She said 'No, not now.' I told her it would only take about five minutes. She knew what we was supposed to talk about. But after telling me to meet her she refused to keep her promise. I told the girls that she was riding with that I

only wanted to talk to her, and this wouldn't take very long. By this time she had walked to the opposite side of the car that she was going to get into. And when I approached her she raised her purse up and started opening her purse, at this time I don't know what happened. All of the time that I was there I was frightened because I thought that maybe she had this man that she was living with in someplace close around, to harm me. That's why I didn't want to take over five minutes of conversation. I didn't mean to shoot her. I didn't have any intentions of shooting her. I had the gun in my outside coat pocket, I had taken it out when she went into her purse and I was frightened. I'm not used to handling a gun, and I'm right handed, I had to use my left hand because I have no fingers on my right hand. I don't remember pulling the trigger, but I heard the shot fired. I come straight to the police station and gave myself up."

He further said:

"One thing that made me carry the gun was because I had been threatened. When my wife left me she taken all the money which was about $4,500.00 in cash. This was the financial problem I spoke of. I was trying to get her to tell what she did with the money or would she be willing to give me half of it back. This was my money, all that I had saved in a lifetime. She did call me about the money but refused to tell me what she did with it or to say that she would be willing to divide it."

The entire statement was read, without objection, to the defendant while he was on the stand in the presence of the jury, and he admitted that he had so stated. In his testimony at the trial the defendant at no time tes-

208

tified that when the gun was discharged he was holding it in his right hand. He also testified that he did not recall pulling the trigger, nor did he know when the gun was discharged.

OPINION:

 (1) There is no question that on about 4:30 p. m., on March 5, 1963, in the vicinity of the Economy Products plant between Washington and Madison Streets, in the City of Chicago, a woman went to her death; nor is there any question that her death was caused by a bullet discharged from a gun held by the defendant. The only question is as to whether or not the defendant intended to kill her.

It is true that there were certain slight discrepancies in the testimony of the State's witnesses with reference to the location of the various witnesses, the defendant and the deceased. The defendant makes much of the fact that his right hand was mutilated—how badly mutilated does not definitely appear—but it is certain that his little finger was intact and that possibly his other fingers were not removed back of the knuckles. In any case, the jury had full opportunity to observe his hand when his counsel requested him to draw a gun with his right hand and to hold it in that hand. Furthermore, in the written statement heretofore referred to, which was made by the defendant to Officers Zaleski and Brown immediately after his arrest, and which was vouched for by the defendant on the witness stand and read to the jury, the defendant said he had taken the gun out of his pocket when his wife went into her purse and thereby frightened him. He said, "I'm not used to handling a gun and I'm right handed. *I had to use my left hand because I have no fingers on my right hand.* I don't remember pulling the trigger but I heard the shot fired." [Emphasis supplied.]

After careful consideration of the evidence we find that the defendant did not sustain his contention that he was not proved guilty beyond a reasonable doubt.

■ (2) The defendant also objects to the failure of the court to give two instructions dealing with "excusable homicide." The instructions which were offered by the defendant [2] were based on the prior Illinois law dealing with homicide [c 38, § 370, Ill Rev Stats 1959]. Under the present Illinois law homicide by misadventure is not defined but is integrated into the definition of homicide as given in Article 9 of the Criminal Code. It is unnecessary to go into the provisions of the Code since the two instructions offered by the defendant were not proper in any case, because they contained the statement that the defendant, at the time of the homicide, must be doing a *lawful* act. Carrying and drawing a gun is not a lawful act.

The defendant, in answer to the State's contention, attempts to justify the instructions by arguing that the State has the duty to show that the defendant had no permit to carry the gun. That is not the law. Counsel also advances a rather odd argument that in some portions of Chicago it is necessary that a person go armed. So far, our legislature has not put such a conclusion into the statutes, and until it does the courts must follow the rules of law as laid down by the legislature. The instructions were properly refused.

---

[2] "The Court instructs the jury that excusable homicide by misadventure occurs when a person in doing a lawful act unaccompanied by any culpable negligence, without any intention of killing, yet unfortunately kills another person. Under these circumstances said homicide shall be considered excusable."

"The Court instructs the jury that excusable homicide by misadventure occurs when a person in doing a lawful act, without any intention of killing, yet unfortunately kills another person. Under these circumstances said homicide shall be considered justifiable or excusable and the defendant shall be found not guilty."

■ (3) Counsel also objects to the refusal of the court to instruct the jury with regard to verbal admissions on the part of the defendant.[3] The admission in question is undoubtedly the statement made by Sgt. Youhn that the defendant, when he first talked to him in the police station, had said (in response to a question asked by the sergeant) that he had killed his wife because "she stole my money." The admission cannot apply to the written statement of the defendant taken by Detectives Zaleski and Brown, which was brought out in the first instance by the defendant's counsel and was admitted in evidence without objection. In that statement the defendant said that at the time his wife left him she had taken all the money—about $4,000 in cash— and that he intended to talk to her concerning that money. He was trying to get her to tell him what she did with the money, and to find out whether or not she would give half of it back. The instruction as presented was not clear and, in our opinion, would not enlighten a jury of laymen. In support of his contention that the instruction should have been given, the defendant had cited certain cases which, in our opinion, are not applicable because of the form of the instruction.

In People v. Fahrner, 330 Ill 516, 162 NE 133, the court held that the refusal of the trial court to give the following instruction was not error:

" 'The court instructs the jury that verbal admissions should be received with caution and are sometimes the most unreliable of all evidence and the jury should carefully consider all the evidence and

---

[3] Refused instruction: "Statement of a witness as to verbal admissions of a defendant should be received by the jury with great caution as such evidence is subject to imperfections and mistakes, and it is only when such admissions are deliberately made that the evidence afforded them is of a satisfactory character."

circumstances proved in the case in determining the weight to be given to such admissions.' "

The court said:

"This instruction was objectionable in that it indicates to the jury the weight and credit which should be given to verbal admissions. This is the province of the jury. It was also open to the objection that it might readily be understood by the jury as an opinion of the court concerning the credibility of the evidence of plaintiff in error. The instruction was properly refused."

In Lipsey v. People, 227 Ill 364, 81 NE 348, a case cited by the defendant, attention is called to the fact that under the rule laid down in Marzen v. People, 173 Ill 43, 50 NE 249, the instruction might be proper if it was limited by a statement that the admissions were deliberately made and fully proven.

In the case before us the instruction did contain the limitation that the admissions must be deliberately made. Under the view which we have taken of the form of the instruction, we do not think this limitation would make the instruction good. In a case with a record such as that of the instant case it is necessary that the instructions given by the court be comprehensive, clear and understandable.

■ (4) The defendant also objects that the court erroneously permitted the jury to know which instructions had been requested by the State and which had been requested by the defense. The argument of the Assistant State's Attorney was as follows:

"You will be submitted also, ladies and gentlemen, alternative verdicts; one relative to murder, one relative to two counts of manslaughter, one

voluntary and one involuntary. These are submitted to you, again, we submit, one, murder, because we feel that based upon the evidence that you heard there can be only one verdict and that verdict is murder, but the submitting to you of two alternative instructions as to manslaughter is done with the same intention and the same breath as his various defenses were to you."

The defense moved first that the jury be instructed to disregard the statement, and thereafter moved for a new trial. The court denied the motion for a new trial, and the defendant did not proceed with his motion that the jury should be instructed to disregard the argument.

The defendant relies on Aneals v. People, 134 Ill 401, 25 NE 1022, in which case the court lays down the rule that the instructions should not be marked so as to indicate which side had offered them and that the instructions should go to the jury as the instructions of the court. We do not think the statement made by the State's Attorney with reference to the instructions was of such a character that the jury would have been prejudiced against the defendant. Furthermore, at the time of giving the instructions the court clearly indicated that all the instructions were given by the court as a part of its duty.

■ ■ (5) The defendant also argues that the State's Attorney in his argument so prejudiced the jury that the defendant was thereby deprived of a fair trial. The trial was conducted within a short time after the assassination of President Kennedy. In his opening argument, after both sides had rested, the Assistant State's Attorney stated "that murder in Chicago . . . will not be tolerated, whether he is a mail order killer through the mails of guns such as these. . . ." In his

closing argument counsel who represented the defendant made the following statement:

"Now, over the past two weeks we have been reading in the newspapers quite a bit about mail order purchases of guns. Obviously, from your experience, we know that this is not uncommon, that Emanuel Wade isn't the only one who has purchased a mail order gun."

In the State's Attorney's closing argument the following occurred:

| | |
|---|---|
| Mr. Malek: | Mr. Wade never told the Sergeant the gun went off accidentally. But he makes a big hullabaloo of the fact that Mr. Wade has sense enough to walk into the 12th District police station. If Mr. Oswald— |
| Mr. Moran: | Object. |
| Mr. Malek: | Mr. Moran brought that case up, Judge, not that case up— |
| Mr. Moran: | He isn't here, Judge. |
| The Court: | I didn't hear all that last remark. |
| Mr. Malek: | I started to say if Mr. Oswald— |
| Mr. Moran: | Object. No Mr. Oswald testified, Judge. |
| Mr. Malek: | Mr. Moran brought up that incident, Judge. |
| The Court: | Objection sustained. |

Under the circumstances, the statements made were improper; nevertheless, we have to consider that a reference to mail-order purchase of guns was also made by counsel for the defendant; that the court promptly sustained the objection made by defendant's counsel. We do not think the statements made by the State's Attorney were so prejudicial that the defendant was deprived of a fair trial.

After the verdict of the jury was rendered the trial court denied defendant's motion for a new trial. With that ruling we concur, and the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.